

VIRGINIA
& AMBINDER LLP
Attorneys at Law

New York, New York 10004
Telephone: 212.943.9080

**James Emmet Murphy**
jmurphy@vandallp.com

February 6, 2026

**VIA ECF**
Hon. Sarah L. Cave
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     *Mohamed v. The City of New York,* **Case No. 1:24-cv-09304-SLC**
          **Request for Settlement Approval**

Dear Judge Cave:

Pursuant to *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015), Plaintiffs respectfully submit this letter on behalf of both Parties in support of approval of the negotiated Settlement Agreement ("Agreement" or "Settlement") between Plaintiffs and Defendant, the City of New York ("City"), in the above-referenced case brought under the Fair Labor Standards Act ("FLSA").

For the reasons set forth below, the Settlement, reached via acceptance of the Mediator's Proposal on December 4, 2025, is a fair and reasonable resolution of a *bona fide* dispute.

Accordingly, the Parties respectfully request that it be approved. The Settlement Agreement (**Exhibit 1**) and a Proposed Order (**Exhibit 2**) are attached, along with supporting declarations from Plaintiffs' Counsel, James Murphy (**Exhibit 3**).

Plaintiffs – 413 individuals employed by the Defendant as Sanitation Officers for the Department of Sanitation New York ("DSNY") – have been informed of the terms of the Settlement, including their individual Settlement Payments, the amount of the Service Award, and the amount Plaintiffs' counsel is seeking for attorneys' fees and costs. The undersigned has personally spoken to dozens of Plaintiffs in this case who unanimously expressed approval of these terms. They have been provided with an opportunity to dispute their allocated payments, or to otherwise object to the Settlement terms. ***There have been no objections to the Settlement.*** Murphy Decl., ¶6.

I.          **Claims and Defenses and Asserted**

Plaintiffs filed this case on September 5, 2024. Dkt. 1. Plaintiffs allege that Defendant failed to:

1) Pay overtime for work performed before and after Plaintiffs' scheduled shifts, including the pre- and post-shift time captured in the Garage Blotters and via Webclock time entries and including but not limited to the 15-minute pre-shift unpaid time required by the Parties' Collective Bargaining Agreement ("CBA") ("Pre- and Post-Shift Overtime Claim");

2) Include required differential payments in Plaintiffs' overtime pay rate ("Regular Rate Claim");

3) Pay overtime at the rate of one and one-half times the regular rate of pay, instead compensating Plaintiffs for hours in excess of 40 at a straight time rate ("Straight Time Overtime Claim"); and

4) Timely pay overtime ("Late Payment of Overtime Claim").[1]

Plaintiffs also allege that Defendant's conduct lacked good faith and reasonableness, thus entitling Plaintiffs to liquidated damages in an amount equal to their backpay, and that Defendant willfully violated the law, thereby extending the statute of limitations from two to three years under 29 U.S.C. § 255(a).

Defendant filed its Answer on November 27, 2024, denying all liability and asserting affirmative defenses. Dkt. 39. While not specifically included in its Answer, Defendant's primary defense to liability is that Plaintiffs work only 37.5 hours per week because they receive 2.5 hours of paid meals each week (i.e., five, 30-minute paid lunches), which it alleges are duty-free. Under Defendant's theory, even with the unpaid pre-shift time required by the CBA, Plaintiffs do not reach the 40-hour overtime threshold.

## II.    Procedural and Settlement History

On December 17, 2025, the parties stipulated to distribution of a notice pursuant to 29 U.S.C. § 216(b) informing potential collective action members of the pendency of this suit. Thereafter, notice was distributed to potential collective action members, whose consent to join forms were required to be submitted by March 30, 2025.

On April 18, 2025, and pursuant to the Parties' request, the Court referred this case and a companion case consolidated for settlement purposes only, *Torres, et al., v. City of New York,* 1:24-cv-09304 to mediation.  Dkts. 103, 104.[2] Thereafter, Defendant produced Plaintiffs' payroll data (FISA) on July 1, 2025, and work schedule data (CityTime) for Plaintiffs on July 24, 2025.

Prior to submitting Plaintiffs' settlement demand, Counsel for the Parties discussed streamlining negotiations given that this case involves the same claims as those advanced and

---

[1] Upon review of the payroll and timekeeping records produced by Defendant, Plaintiffs discovered that Defendant regularly paid approved overtime untimely. The Parties included this claim in their settlement negotiations without requiring Plaintiffs to formally amend the Complaint.

[2] Pursuant to the Parties' December 4, 2025 status report, the Parties have agreed that the settlement agreements in *Torres* and *Mohamed* will be submitted separately for the Court's approval. Dkt. 124.

settled in *Wynne, et al., v. City of New York,* 1:23-cv-9955 (*Wynne* Dkt. 76) (Judge Gorenstein's December 10, 2024, approval of Parties' *Wynne* Settlement). Accordingly, on August 15, 2025, Plaintiffs submitted their official settlement demand and three days later, Plaintiffs sent their "*Wynne* Model" settlement recommendation. Plaintiffs provided Defendant with their expert's damages programming.

On September 17, 2025, defense counsel identified two calculation issues flagged by their expert in his review of Plaintiffs' programming. Plaintiffs agreed to make corrections based on these issues and on September 19, 2025, sent a revised official opening settlement demand and a revised *Wynne* Model settlement recommendation.

On November 17, 2025, Defendant provided Plaintiffs with a counter and on that same date, the Parties submitted and exchanged Mediation Statements.  On December 1, 2025, the Parties participated in an in-person mediation with Your Honor, during which counsel made opening statements and exchanged offers and counter-offers, but were unable to reach an agreement. At the conclusion of the mediation session, Your Honor made a Mediator's Proposal, inclusive of all material terms, that would fully resolve the case. Both Parties accepted the Mediator's Proposal by the response deadline on December 4, 2025. Thereafter, the Parties continued to negotiate the language of the Settlement, made concessions where necessary, and reduced their agreement to writing. Murphy Decl. ¶ 2. The Parties signed the Agreement on February 5, 2026. *See* Ex. 1.

### III.    Terms of the Proposed Settlement Agreement

The Agreement provides that Defendant will pay **$5,084,035.00** ("Settlement Amount") to resolve the lawsuit. The Settlement Amount will be paid as follows: (1) **$2,509,090** in backpay ("Backpay Amount") by checks made payable to each Plaintiff (via direct deposit for current employees or by check delivered to Plaintiffs' Counsel for separated employees) in the amount of each Plaintiff's share as determined by Plaintiffs' Counsel (described below); and (2) one check in the amount of **$2,574,945.00** constituting liquidated damages, Service Awards, statutory attorneys' fees, and litigation expenses payable to Plaintiffs' Counsel for distribution to Plaintiffs ("Lump Sum Amount"). Murphy Decl. ¶ 3.

Each of the 413 Plaintiffs was notified of the terms of the settlement, including the manner the allocations would be calculated in; that a contingency fee would be deducted from the total recovery obtained; and that a service award in the amount of $3,000.00 would be sought for the named Plaintiff. *See* December 10, 2025 letter to Plaintiffs, annexed to the Murphy Decl as Exhibit A. Each Plaintiff was given a mechanism to dispute any of the terms of the settlement; although the undersigned personally spoke with dozens of opt-in Plaintiffs, no plaintiff expressed any objections to the settlement, and each Plaintiff the undersigned spoke to expressed support for the terms of the settlement. Pursuant to the notice provided to Plaintiffs and in accordance with ¶ 2.4 of the Settlement, the contingency fee and expenses will be deducted from the Lump Sum Amount. The Lump Sum Amount will be distributed as follows:[3] (1) **$877,267.00** in liquidated damages ("Liquidated Damages"); (2) **$3,000.00** in a service award to named Plaintiff Moshin Mohamed;

---

[3] Defendant takes no position regarding the distribution of the Lump Sum Amount as those amounts were determined solely by Plaintiffs' Counsel pursuant to their agreements with Plaintiffs.

and (3) a 33 and 1/3% contingency fee to Plaintiffs' Counsel in the amount of **$1,694,678.00** calculated after expenses are deducted.

The Net Settlement Fund[4] will be divided among the Plaintiffs as follows: For each week that a Plaintiff was employed as a Sanitation Supervisor during the recovery period, the Plaintiff will receive an amount equal to the weekly allocation for all Sanitation Supervisors in the companion <u>Torres</u> action. This calculation results in a total payment to Sanitation Supervisors of **$2,282,011.68**. For each week that a Plaintiff was employed as a Sanitation Superintendent, each Superintendent is entitled to one point; each Plaintiff's allocation of the percentage of total points for all Superintendents for their time as a Sanitation Superintendent is then divided by the total amount of net payments attributable to Superintendents.[5] The recovery period for each Plaintiff is three years prior to the date a Plaintiff's consent-to-sue form was filed in Court,[6] up to December 1, 2025, or their last day of employment as a Sanitation Supervisor, whichever is earlier. The points are then divided into the Net Settlement Fund of **$1,104,345.32** to determine the dollar value of a point.

In consideration of and exchange for this Settlement, Plaintiffs agree to release the Defendant for all wage and hour claims through December 1, 2025. The Parties agreed to this release date because it is the date through which damages are extrapolated. Murphy Decl., ¶ 4.

Plaintiffs' Counsel informed each Plaintiff, in writing, of the Settlement Amount, the methodology for assigning points, the value of a point, and the number of points calculated for each Plaintiff. They were also informed of the weekly allocation, net of attorneys' fees and service awards, attributable to each Sanitation Superintendent ($53.79), and the amount attributable to each Sanitation Supervisor ($48.88). Plaintiffs were also informed of their individual payment, the amount of the total contingency fee, their proportional share of that fee, and the amount of the Service Awards. Plaintiffs had until January 5, 2026, to object to the settlement and/or to dispute their assignment of points. They have also been given the opportunity to review amount of the settlement awards of all other Plaintiffs; this information was provided to each Plaintiff. ***There have been no objections***. The reaction of the Plaintiffs has been nothing but positive. Murphy Decl., ¶¶ 5-6.

---

[4] The Net Settlement Fund is the amount remaining after litigation expenses, the 33 and 1/3% contingency fee, and Service Awards are deducted from the Settlement Amount. Exhibit A to the Settlement lists Plaintiffs' share of the Net Settlement Fund.

[5] Using weeks of employment during the recovery period to determine the Plaintiffs' share of the settlement is the same methodology used in a multitude of other FLSA cases involving complicated off-the-clock claims and a variety of different claims wherein the risks and valuations of each claim and the amount of work time the Plaintiffs may win are difficult to separately quantify for each Plaintiff and for each claim. *E.g.*, *Wynne, et al., v. City of New York,* 1:23-cv9955, Dkt. 76 (S.D.N.Y. December 10, 2025) (approving FLSA settlement agreement for 212 Sanitation Officers using same distribution method); *Caldwell v. City of New York,* 1:23-cv-03899, Dkt. 44 (S.D.N.Y. May 30, 2024) (approving FLSA settlement for 33 Motor Vehicle Operators and Laborers with the Department of Homeless Services using the same distribution methodology).

[6] However, if a Plaintiff was also a Plaintiff in *Wynne*, the earliest day of that Plaintiff's recovery period in this case is August 22, 2025, which is one day after the release date in the *Wynne* Settlement Agreement.

IV.    **Applicable Factors for Approving FLSA Settlements**

A settlement in an FLSA collective action is not effective unless it is approved by either a district court or the United States Department of Labor. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599600 (2d Cir. 2020); *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015). "As a result, district courts in this Circuit routinely review FLSA settlements for fairness before approving any stipulated dismissal." *Fisher*, 948 F.3d at 599-600. "Courts generally recognize a 'strong presumption in favor of finding a settlement fair' in cases like this one brought . . . under the FLSA, as they are 'not in as good a position as the parties to determine the reasonableness of an FLSA settlement.'" *Martinez v. 189 Chrystie St. Partners, LP*, 2024 WL 1853179, at *2 (S.D.N.Y. Apr. 29, 2024) (quoting *Souza v. 65 St. Marks Bistro*, 2015 WL 7271747, at *4 (S.D.N.Y. Nov. 6, 2015)); *see also Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (same).

Courts evaluating whether FLSA settlements are reasonable consider the following factors:

(1) the plaintiffs' range of possible recovery;

(2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses;

(3) the seriousness of the litigation risks faced by the parties;

(4) whether the settlement is the product of arm's-length bargaining between experienced counsel; and

(5) the possibility of fraud or collusion.

*Wolinsky*, 900 F. Supp. 2d 332, 336 (S.D.N.Y. 2012); *Fisher*, 948 F.3d at 599-600 ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky*."). Under the Second Circuit's *Fisher* decision, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Fisher*, 948 F.3d at 606.

A.    **Application of the *Wolinsky* Factors to the Settlement**

As discussed below, the proposed Settlement is fair and reasonable and should be approved.

**1. Plaintiffs' Possible Range of Recovery**

The Settlement Amount of **$5,084,035.00** is based on damages calculations prepared by Plaintiffs' expert witness, Dr. Louis Lanier, which were reviewed and analyzed by Defendant's expert witness, Dr. Christopher Erath, as part of the Parties' arm's-length negotiations. Murphy Decl., ¶ 7.

The Settlement Amount is equal to approximately **36.5%** of Plaintiffs' "best case scenario," meaning the settlement obtained equals 43% of the damages Plaintiffs could potentially win if Plaintiffs convinced the jury and/or Court that: (1) a three-year recovery period applies to the Claims because the violations were willful; (2) Plaintiffs worked through all five paid 30-minute meal periods each week during the 3-year recovery period, or the Court found that Defendant must

treat the 30-minute meal periods as work hours regardless of whether they are *bona fide* meal periods; (3) Plaintiffs worked a full *25 minutes* per day without pay before and/or after every shift (i.e., 10 minutes *more than* the daily 15 minutes required by the CBA); (4) Defendant failed to properly calculate the overtime pay rate; (5) Defendant failed to timely pay overtime compensation; (6) Defendant failed to establish both good faith and objective reasonableness thereby entitling Plaintiffs to a full compensatory award of liquidated damages; and (7) the case is properly maintained as a collective action. Murphy Decl., ¶ 8.

Neither the Mediator's Proposal nor the Parties' Settlement Agreement specifies the allocation of the settlement across the alleged categories of damages claimed by Plaintiffs. Thus, there may be many ways in which the settlement sum could be allocated. By way of example only, one way to look at the **$5,084,035.00** Settlement Amount is that it represents, for a full three-year period: backpay equal to 50% of Plaintiffs' Regular Rate claim, with liquidated damages equal to that amount; backpay equal to 100% of Plaintiffs' Straight Time claim with liquidated damages equal to 84.7% of that amount; liquidated damages equal to 70% of Plaintiffs' Delayed Overtime claim; backpay equal to 75% of the amount owed for 15 minutes of pay for every shift worked for Plaintiffs' Pre- and Post-Shift Overtime claim with liquidated damages equal to 84.3% of that amount; and the reimbursement of statutory attorneys' fees and expenses totaling $65,855.00. The three-year statute of limitations on the settlement of all claims is notable, because to achieve this outcome, Plaintiffs would have been required to prove that Defendant willfully violated the law; otherwise, a two-year statute of limitations would apply. 29 U.S.C. § 255 (a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The average settlement payment to the 413 Plaintiffs *after* all fees, expenses and Service Awards are deducted is **$8,199.41.** Murphy Decl. ¶ 11.

Considering the risks associated with proceeding with these claims through discovery, motions practice over the applicability of Defendant's meal period offset defense, trial, establishing collective-wide damages, and possible appeals, the Settlement Amount is certainly a reasonable resolution considering the possible range of recovery. *See, e.g.*, Wynne, (Dkt. 76)(approving settlement agreement in earlier Sanitation Officer FLSA case, where Plaintiffs report that settlement reflects 47% of "best case scenario"); *Zorn-Hill v. A2B Taxi LLC*, 2020 WL 5578357, at *4 (S.D.N.Y. Sept. 17, 2020) (12.5% of "best-case scenario"); *Redwood v. Cassway Contracting Corp.*, 2017 WL 4764486, at *2 (S.D.N.Y. Oct. 18, 2017) (approximately 30% of total alleged damages); *Gervacio v. ARJ Laundry Servs. Inc.*, 2019 WL 330631, at *1 (S.D.N.Y. Jan 25, 2019) (20% of total possible recovery). The settlement here certainly falls within the range of approved recoveries in FLSA litigation.

### 2. Avoiding Anticipated Burdens and Expenses

Litigating FLSA claims through fact discovery, expert discovery, motions for summary judgment, motions to determine if collective treatment at trial is appropriate, and through a multiday or multi-week trial, and appeals, would be a resource-intensive process demanding significant additional costly litigation for both Parties.

Even with early settlement, significant time and labor has been spent by Plaintiffs' Counsel prior to and in reaching the Settlement. Murphy Decl., ¶ 9. During the time spent litigating this case, Plaintiffs' Counsel have not been paid for any of the work that they have performed. Murphy Decl. ¶ 9 This uncompensated work has been substantial and includes: (1) interviewing Plaintiffs and investigating claims; (2) researching the claims and defenses; (3) preparing and filing the Complaint; (4) sending out a notice to similarly situated individuals pursuant to 29 U.S.C. § 216(b), receiving consent to join forms, and speaking with potential plaintiffs who had questions about the

6

lawsuit; (5) negotiating and reaching an agreement with Defense Counsel on the data necessary to calculate damages; (6) reviewing documents related to Sanitation officers' arrival and departure times; (7) preparing settlement demands; (8) researching and responding to Defendant's meal period defense to damages including analyzing data and interviewing witnesses related to new "check the box" meal attestation policy; (9) preparation for mediation including preparing a mediation statement, opening statement, and participating in pre-mediation calls and Zoom meetings with the Plaintiff Settlement Team to discuss settlement possibilities; (10) participating in an in-person Settlement Conference; (11) negotiating and drafting the written terms of the Settlement Agreement; (12) notifying the Plaintiffs of the terms of the Settlement Agreement; and (13) preparing the settlement approval papers. Murphy Decl., ¶ 9.

Without this Settlement, both Parties would need to spend significant additional time and resources in extensive discovery, including preparing and responding to written discovery; conducting numerous Plaintiff, Fed. R. Civ. P. 30(b)(6), and fact witness depositions; engaging in expert discovery and motions practice; preparing for trial, including meeting with and preparing numerous witnesses for trial testimony, preparing trial exhibits, drafting and arguing motions *in limine* and other pre-trial motions or briefing, drafting jury instructions, voir dire, and a verdict form, and preparing opening statements; presenting the case to a jury; preparing summation; presenting the issue of liquidated damages to the Court for a decision; likely post-trial motions practice; and possible appeal. In short, absent settlement, the anticipated burdens and expenses on both Parties would be significant.

### 3. Seriousness of Litigation Risks

There was risk to both sides on all claims, with the most significant risk for both sides in the possible range of recovery associated with damages for the amount of uncompensated work performed pre- and post-shift. If Defendant was correct that it could offset the weekly paid 2.5 hours of meal periods against the (at least) weekly 1.25 hours of pre-shift work required by the CBA, there would be no pre-shift damages. Similarly, if Defendant could establish that the June 2025, implementation of its "check the box" meal attestation policy completely insulated it from liability for unpaid pre and post-shift overtime, Plaintiffs' damages after June 2025 would have been minimal if at all. Likewise, if Plaintiffs were correct that either (a) Plaintiffs work through the paid meal periods, so those hours must be counted as work hours; or (b) regardless of having "attested" to having received their meal periods, the 2.5 hours of paid meal time must be treated as work time, then Defendant's liability would have been much greater. Additionally, there was litigation risk with respect to the issues of whether the Defendant's violations were willful and lacked good faith or reasonableness. There was also substantial litigation risk on Plaintiffs' Regular Rate claim to both Parties given the huge gap between the Parties' assessment of that claim. Given the uncertainty over the potential outcome, both Parties were motivated to settle this dispute early in the litigation.

### 4. Arm's-Length Bargaining

Both Parties engaged in good faith, arm's-length negotiation in reaching this Settlement, including an in-person Settlement Conference with Your Honor. When an agreement was not reached by the conclusion of that Settlement Conference, the Parties ultimately required a Mediator's Proposal to reach final agreement. Prior to mediation, Plaintiffs' expert witness analyzed detailed payroll information and timekeeping records and Plaintiffs shared those calculations and all underlying programing with Defendant. Defendant's expert reviewed and

analyzed Plaintiffs' damages calculations, and these calculations were relied upon by the Parties
to eventually, with Your Honor's guidance and assistance, negotiate the Settlement Amount.


Ultimately, the Parties reached an agreement in principle on December 4, 2025, which was
approved by the Settlement Team. Murphy Decl., ¶ 2. Thereafter, the Parties further negotiated the
language of the Settlement Agreement. Without doubt, the Settlement was the product of
armslength bargaining.

### 5. Possibility of Fraud or Collusion

Given the thorough and intensive investigation into this matter by each side to prepare for
the Settlement Conference, and the Parties' arm's-length negotiations with Your Honor's
assistance, as well as the Parties' good faith participation in mediation, there was no opportunity
for fraud or collusion. The Parties' Counsel represented their clients zealously and obtained what
both Parties consider to be a fair and reasonable settlement of a *bona fide* dispute consistent with
standards established in the Second Circuit for FLSA settlements.

### V.          The Service Awards to the named Plaintiff is Appropriate[7]

Courts in this district have recognized that, "[i]n FLSA collective actions, just as in Rule
23 class actions, service awards are important to compensate plaintiffs for the time and effort
expended in assisting the prosecution of the litigation, the risks incurred by becoming and
continuing as a litigant, and any other burdens sustained by the plaintiff." *See, e.g.*, *Sanz v. Johnny
Utah 51 LLC*, 2015 WL 1808935 (S.D.N.Y. 2015) (quoting *Diaz v. Scores Holding Co., Inc.*, 2011
WL 6399468, at *3-4 (S.D.N.Y. 2011)).

The Service Awards will be paid to the two Settlement Team members, one of whom also
served as a Named Plaintiff, and both of whom assisted in settlement discussions, approving the
Settlement and recommending the Settlement to the collective. Murphy Decl., ¶10. The Service
Award totals **$3,000.00**. All 413 Plaintiffs have been informed of the Service Award Amount, and
none have objected. Murphy Decl., ¶10.

The named Plaintiff spent time gathering facts for the initial Complaint, participating in
telephonic and Zoom meetings to discuss settlement strategy, speaking to numerous other opt-in
Plaintiffs who had questions about the case; providing Plaintiffs' Counsel with samples of
documents showing pre-shift work time, participating in the in-person Settlement Conference,
reviewing damages calculations, assessing the various settlement scenarios and facilitating
recommending the Settlement to the other Plaintiffs. Thus, the time and effort exerted by the named
Plaintiff resulted in a significant benefit to the collective. *Id*. The Settlement Team's willingness to
serve the collective achieved favorable results for all 413 Plaintiffs (e.g., average individual
settlement amount is **$8,199.41 *after*** fees, expenses, and the Service Award Amount are deducted).
*Id.* at ¶ 11. The Service Award is well within the range of awards approved by courts in this Circuit
in FLSA cases. *See, e.g.*, *Wynne* Dkt. 76 (approving service awards in the amount of $3,000 for
each Settlement Team Member); *Mercado v. Metropolitan Transportation Auth.*, 2023 WL

---

[7] Defendant takes no position regarding the Service Award Amount provided to the Settlement
Team.

4350612, at *3 (S.D.N.Y. 2023) (approving service award of $12,500 to lead named plaintiff and $10,000 to each of four other named plaintiffs in FLSA action); *Williams v. City of New York*, Case No. 16-cv-08671 (S.D.N.Y.), Dkt. 100 (Nov. 7, 2022) (approving service awards of $4,500 each in FLSA case); *Hyun v. Ippudo USA Holdings*, 2016 WL 1222347, at *2 (S.D.N.Y. 2016) (awarding $6,000 to each of five named plaintiffs as service award, for $30,000 total equaling 5% of total settlement amount, in FLSA case); *Kudo v. Panda Restaurant Group, Inc.*, 2015 WL 13879800, at *4 (S.D.N.Y. 2015) (awarding $10,000 to named plaintiff and $5,000 each to four other plaintiffs in FLSA collective); *Diaz v. Scores Holding Co., Inc.*, 2011 WL 6399468, at *3-4 (S.D.N.Y. Jul. 11, 2011) (awarding $7,000 to four named plaintiffs plus $1000 to two additional plaintiffs as service awards, totaling $30,000 and equal to approximately 7% of settlement in FLSA collective action).

## VI.    The Attorneys' Fees and Costs are Reasonable[8]

Each of the 698 Plaintiffs signed a written contract with Plaintiffs' Counsel at the outset of this case in which they agreed to a 33 and 1/3% contingency fee. Murphy Decl., ¶12. Accordingly, under the Settlement, after expenses in the amount of $31,921.79 are reimbursed, Plaintiffs' Counsel will be paid **$1,694,978.00** which represents a thirty-three and one-third percent (33 1/3%) contingency fee of the Settlement net of costs. Murphy Decl., ¶ 12. *See Run Guo Zhang v. Lin Kumo Japanese Rest., Inc.*, 2015 WL 5122530 at *1 (S.D.N.Y. 2015) ("The Court's view is that attorneys' fees, when awarded on a percentage basis, are to be awarded based on the settlement net of costs").

### A. Plaintiffs' Counsel's Application for a 1/3 contingency fee, which every Plaintiff was made aware of none objected to, Should be Honored

Plaintiffs' counsel notified each Plaintiff in writing both of the aggregate amount of attorneys' fees they would be seeking, and of the share of each Plaintiff's allocation which would be attributable to such fees should the Court grant Plaintiff's application. *See* Murphy Declaration, Ex. A. No Plaintiff objected to this application. Each of the dozens of Plaintiffs who spoke with the undersigned was informed in detail about Plaintiff's counsel's application; none objected.

Moreover, courts in this Circuit recognize that where small claims can only be prosecuted through aggregate litigation, such as in the instant FLSA case, attorneys who fill the "private attorney general" role must be compensated for their efforts through enforceable contingent fee agreements. *See, e.g.*, *Viafara v. MCIZ Corp.*, 2014 WL 1777438, at *27-28 (S.D.N.Y. 2014) (approving 33 1/3 % fee consistent with norms of fee shifting litigation in Second Circuit); *Zeltser v. Merrill Lynch & Co.*, 2014 WL 4816134, at *9 (S.D.N.Y 2014) (same); *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 WL 3778173, at *4 (S.D.N.Y. 2014) (same); *Clem v. KeyBank, N.A.*, 2014 WL 2895918, at *10-11 (S.D.N.Y. 2014) (same). Indeed, many individual litigants, including the Plaintiffs here, likely "cannot afford to retain counsel at fixed hourly rates . . . yet they are willing to pay a portion of any recovery they may receive in return for successful representation." *deMunecas v. Bold Food, LLC*, 2010 WL 3322580, at *21-22 (S.D.N.Y. 2010) (quoting *In re Abrams*, 605 F.3d 238, 245-46 (4th Cir. 2010)).

---

[8] Defendant takes no position regarding Section VI of this letter other than that Defendant agreed to pay hourly attorneys' fees and costs in the amount of $65,855.00.

Recently, Judge Gorenstein cogently described the reason that private contingent fee agreements should be honored in the context of FLSA cases:

> [A]ttorneys who take on FLSA cases on contingency bear the risk of having to litigate cases in which the recovery may not adequately compensate them for the time expended. *See generally King v. Fox*, 2004 WL 68397, at \*5 (S.D.N.Y. Jan. 14, 2004) ("Contingency fees account for the risk taken in representing a client."). Therefore, in cases where attorneys spend fewer hours than would be required to match the amount in the contingency arrangement, it is only proper that they be permitted to collect their contracted fee given the risk they have assumed. "[A] contingency fee arrangement provides an incentive to counsel to take on cases that are less than sure winners." *Blizzard v. Astrue*, 496 F. Supp. 2d 320, 325 (S.D.N.Y. 2007). Finding such contingency fee arrangements not "reasonable" under *Cheeks* whenever the attorney is compensated at a high hourly rate as a result of the contingency arrangement — or when the fees paid to counsel exceed the "multiplier" that would be considered reasonable in a common fund case — will only serve to diminish the pool of attorneys willing to accept the risk of taking on FLSA cases. See *Almanzar*, —— F.Supp.3d at ——, 2023 WL 6979460, at \*3. ***Such a result runs counter to one of the purposes of the FLSA — to provide an avenue for workers deprived of their just wages to seek redress in the courts — and is therefore rejected.*** *Id.*

*Puerto* v. *Happy Life*, 704 F. Supp. 3d 403, 406-07 (S.D.N.Y. 2023) (emphasis added) (citations in original).

In *Puerto*, the Court found that the one-third contingency fee, exclusive of costs, "is the customary contingency percentage in FLSA cases." *Id.* Further, the Court noted that "Counsel was engaged to represent plaintiff on a one-third contingency fee basis, which in and of itself provided counsel with a strong incentive to settle the case for the maximum recovery possible." *Id.* at \*2. Similarly, here, the contingency fee, itself, provided Plaintiffs' Counsel with a strong incentive to settle the case for the maximum recovery possible.

The contingency fee arrangement here allowed Plaintiffs to secure counsel of their choice. As described fully in the Declaration of James Emmet Murphy, Plaintiffs' Counsel Virginia & Ambinder are nationally recognized experts in wage and hour law, have recovered hundreds of millions of dollars for hundreds of thousands over workers over the last three decades, and their expertise benefited the Plaintiffs greatly. Murphy Decl. ¶¶ 13-23. The undersigned has successfully argued in the Second Circuit Court of Appeals; the New York Court of Appeals; the New York Appellate Divisions for the First, Second, and Fourth judicial departments; has conducted class action jury trials; and obtained what is believed to be the largest wage and hour judgment in the history of the New York State court system, $88,340,360.57 for workers underpaid for their work making school lunches for New York City public schools.

Plaintiffs' Counsel undertook to prosecute this action without any guarantee of payment. Murphy Decl. ¶ 19 Plaintiff's Counsel were required to make a significant investment of time and resources without a guarantee of payment of any kind. Plaintiffs' claims would have been hard fought at summary judgment and trial by Defendant, and Defendant would have attempted to reduce or eliminate the damages owed to the Plaintiffs. *Id.*

10

As reflected in the Settlement Agreement and the notice to the Plaintiffs, Plaintiffs understand that, should the Court grant Plaintiff's Counsel's request for attorneys' fees, 33 and 1/3% of the total recovery (after deduction the service award) will be attributable to Plaintiffs' Counsel. They are entitled to the benefit of their bargain and to the expertise of their chosen "private attorneys general." Moreover, all 413 Plaintiffs have been notified of the actual dollar amount that will be deducted from their settlement payment as attorneys' fees, and none have objected.

### B. The Percentage Sought for Attorneys' Fees is customary in FLSA Cases in this Circuit

It is settled that "one-third of the total award is the customary contingency percentage in FLSA cases." *Garcia v. Atlantico Bakery Corp.*, 2016 WL 3636559, at *1 (S.D.N.Y. June 29, 2016). "[C]ourts regularly approve attorney's fees of one-third of the settlement amount in FLSA cases.'" *Xiao v. Grand Sichuan Intn'l St. Marks, Inc.*, 2016 WL 4074444, at *3 (S.D.N.Y. 2016) (citing *Meza v. 317 Amsterdam Corp.*, 2015 WL 9161791, at *2 (S.D.N.Y. 2015)). *See also Martinez v. 189 Chrystie St. Partners, LP*, 2024 WL 1853179, at *2 (S.D.N.Y. 2024) ("Although there is not a proportionality requirement, attorney's fees in FLSA cases generally amount to a third of the settlement award."); *Manjarrez v. Bayard's Ale House LLC*, 2022 WL 17363952, at *2 (S.D.N.Y. 2022) (attorneys' fees pursuant to an FLSA settlements "generally amount to a third of the settlement award."); *Bannerman v. Air-Sea Packing Grp.*, 2020 WL 408350, at *3 (S.D.N.Y. 2020) (approving attorneys' fees of 33 and 1/3%); *Bryant v. Potbelly Sandwich Works, LLC*, 2019 WL 1915298, at *15 (S.D.N.Y. 2020) (in FLSA/Rule 23 hybrid, approving one-third as "reasonable and well within the accepted range awarded in wage and hour cases in this District and throughout the Second Circuit"); *Cruz v. Sal-Mark Rest. Corp.*, 2019 WL 355334, at *21 (N.D.N.Y. 2019) (approving one-third fee, noting that a "presumptively reasonable fee takes into account what a reasonable, paying client would pay" and this "supports a one-third (33.33%) recovery in a case like this one where Class Counsel's fee entitlement is entirely contingent upon success"); *Chung v. Brooke's Homecare LLC*, 2018 WL 2186413, at *3-4 (S.D.N.Y. 2018) (awarding one-third fee, noting that "[c]ourts routinely award 33.33% of a settlement fund as a reasonable fee in FLSA cases"); *Penafiel v. Babad Mgmt. Co., LLC*, 2018 WL 1918613, at *9 (S.D.N.Y. 2018) (awarding 33.3% fee, noting "[c]ontingency fees of one-third in FLSA cases are routinely approved in this Circuit").

Plaintiffs' 33 and 1/3 % contingency fee should be approved as it is the norm.

### C.    In Light of the Fee Agreements, A Lodestar Crosscheck Is Unnecessary.

While a lodestar crosscheck may be performed in traditional percentage of common fund cases (where, unlike here, there are absent class members who did not contract to pay any particular fee), as courts in this district recognize, it is unnecessary here in light of the specific information provided to each Plaintiff about the amount of attorneys' fees Plaintiff's counsel would be seeking, both in the aggregate and each worker's individual attribution, without any workers objecting. As explained in the *Puerto* case:

> We decline to perform a "lodestar cross check" because it would have no bearing on our assessment of the reasonableness of the fee sought if it turned out that the "lodestar" for counsel's hours (that is, a reasonable hourly rate multiplied by the reasonable number of hours expended) is far less than the one-third contingency payment.

11

*Puerto*, 704 F. Supp. 2d at 604; *see also Martinez v. 189 Chrystie St. Partners, LP*, 2024 WL 1853179, at *2 (S.D.N.Y. 2024) ("Notably, some courts have chosen not to compare the contingency payment to the actual hours expended by counsel, and there is much force to that approach as well."). Further, the settlement, here, is akin to *Puerto* in that:

> [T]here is no common fund created by the settlement. Instead, the plaintiff and the attorney agreed in advance that the attorney would be entitled to one-third of the settlement as attorney's fees. The very purpose of a contractual contingency fee arrangement is to ensure recovery for an attorney <u>regardless of the number of hours actually expended by the attorney</u>.

*Id.* (emphasis in original). S*ee also, Santiago v. City of New York*, 1:24-cv-6254 (S.D.N.Y. September 27, 2025 (SLC) (Dkt. 51) (awarding contingency fee of 1/3 net of expenses and finding it unnecessary to perform lodestar crosscheck where plaintiffs had entered into a 33.33% contingency fee with counsel at outset of litigation); *Wynne* (Dkt. 76) (declining to perform lodestar crosscheck in earlier Sanitation Officer FLSA case where plaintiffs had retainer agreements reflecting a 33.33% contingency fee with counsel); *Guillermo v. Starting C&M Corp.*, 2024 WL 1859733, at *2 (S.D.N.Y. Apr. 29, 2024) (Judge Subramanian declining to perform a lodestar cross check when there is a contractual contingency fee agreement in place); *Disla v. City of New York*, Case No. 22:cv-06693 (S.D.N.Y.), Dkt, 48 (May 19, 2023) (Parties' Request for Approval of Settlement Agreement) and Dkt. 49 (May 22, 2023) (Magistrate Judge Netburn approving FLSA settlement, inclusive of contingency fee of 33.3%, without a lodestar crosscheck); *Feiner v. City of New York*, Case No. 16-cv-08675 (S.D.N.Y.), Dkt. 85 (Dec. 20, 2022) (Parties' Request for Approval of Settlement Agreement) and Dkt. 87 (Jan. 17, 2023) (Judge Gardephe approving $12.5 Million FLSA settlement, inclusive of contingency fee of 30%, without a lodestar cross-check); *Williams*, Case No. 16-cv-08671 (S.D.N.Y.), Dkt. 100 (Nov. 7, 2022) (Judge Gardephe approving $25.8 Million FLSA settlement, inclusive of contingency fee of 30%, without a lodestar cross-check).

Based on the foregoing, no lodestar crosscheck is necessary, the fee is reasonable, and should be approved.

## VII.    Conclusion

For the above reasons, this Settlement is a favorable outcome, a reasonable resolution to a *bona fide* dispute, and it will appropriately compensate Plaintiffs for the overtime pay issues that are the subject matter of this litigation. Accordingly, the Parties respectfully submit that the Settlement, in its entirety, is fair and reasonable and should be approved by the Court.

Sincerely,

Virginia & Ambinder, LLP



_____/s/_____
James Emmet Murphy

cc:    All Counsel of Record (via ECF)